**[J-78-2022] [MO: Brobson, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 22 MAP 2022 |
| | : | |
| Appellee | : | Appeal from the Order of the |
| | : | Superior Court entered May 24, |
| | : | 2021 at No. 1788 MDA 2019 |
| v. | : | Affirming in Part and Vacating the |
| | : | Judgment of Sentence of the |
| | : | Bradford County Court of Common |
| JONATHAN RIVERA, | : | Pleas, Criminal Division, dated |
| | : | September 26, 2019, at No. CP-08- |
| Appellant | : | CR-0000606-2018 and Remanding |
| | : | for Resentencing. |
| | : | |
| | : | ARGUED: November 29, 2022 |

## CONCURRING OPINION

**JUSTICE WECHT**                                                     **DECIDED: June 21, 2023**

In a typical criminal investigation, there comes a point in time when the investigating police officer seeks to question the person believed to be the perpetrator. Sometimes, that questioning proceeds informally and early in the investigation, before the suspect is arrested or read his *Miranda*[1] warnings. At other times, the suspect is formally interrogated at a police station, as the investigation culminates. Regardless of when the interaction occurs, and regardless of what it looks like, in that moment, the suspect is put to a decision. He must choose whether or not to invoke his constitutional right against self-incrimination.[2] The decision that he makes will play a major role in both the course of investigation and the subsequent prosecution of the criminal case.

---

[1]     *See Miranda v. Arizona*, 384 U.S. 436 (1966).

[2]     The Fifth Amendment to the United States Constitution provides:

(continued…)

Either decision—to speak or to remain silent—can in turn generate challenging legal issues. For instance, a suspect who chooses to talk to the police might later contest the adequacy of *Miranda* warnings[3] (if given to him) or the voluntariness of his decision to waive his right to remain silent.[4] Even more complicated problems arise when a suspect elects to remain silent, such as whether a prosecutor can then reference that silence in an effort to obtain a conviction. This is the ultimate question at the center of today's appeal. The answer to that question depends upon whether the suspect invoked the Fifth Amendment before or after being administered *Miranda* warnings, whether the prosecutor seeks to use the silence as substantive evidence or for purposes of impeachment, and whether the silence is offered as a fair response to a defendant's trial tactics. Further complicating the matter, each of these scenarios implicates different governing legal standards. What results is a complex web of legal precepts that trial courts must navigate—often on the fly during the heat of a tense criminal trial—with potentially severe and prejudicial consequences.

---

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; *nor shall be compelled in any criminal case to be a witness against himself*, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

U.S. CONST. amend V (emphasis added). The Pennsylvania Constitution similarly provides that a person "cannot be compelled to give evidence against himself." PA. CONST. art. 1, § 9.

[3]    *See, e.g.*, *Commonwealth v. Johnson*, 399 A.2d 111, 112-13 (Pa. 1979) (outlining the appellant's contention that the *Miranda* warnings administered to him by police officers constitutionally were inadequate).

[4]    *See, e.g.*, *Commonwealth v. Barry*, 454 A.2d 985, 987 (Pa. 1982) (summarizing a juvenile appellant's argument that the waiver of his *Miranda* rights was not voluntary).

It is easy to become entangled in the complexities of this area of the law and to apply an incorrect standard. Here, by applying pre-*Miranda* standards to a post-*Miranda* case, the Superior Court did exactly that. The Majority successfully and accurately untangles the knot woven by the Superior Court's conflation of two separate legal standards. I join the Majority Opinion in full. I write here to suggest how prosecutors can better avoid introducing prejudice into trials that implicate this area of law.

In our legal system, the privilege against self-incrimination is no mere technicality. To the contrary, it stands among only a few other rights as truly fundamental to the "American concept of ordered liberty."[5] The "right of the accused to resist any effort to force him to assist in his own prosecution"[6] is an "'essential mainstay' of our constitutional system of criminal justice."[7] "The privilege constitutes an essential restraint upon the

---

[5]     *Commonwealth v. Cosby*, 252 A.3d 1092, 1139 (Pa. 2021) (citing *Commonwealth v. Taylor*, 230 A.3d 1050 (Pa. 2020)).

[6]     Michael Hor, *The Privilege Against Self Incrimination and Fairness to the Accused*, SING. J. LEGAL STUD. 35 (1993). The author offers the following with regard to the privilege against self-incrimination:

> Perhaps there is no area in which the discrepancy between theory and practice is greater than in the privilege against self-incrimination. Conceptually, it would seem that if there is any single organizing principle in the criminal process, it is the right of the accused to resist any effort to force him to assist in his own prosecution. It provides substance to the common law ideal of a fair trial through an adversarial or accusatorial process. The parties to a criminal prosecution are seen as competitors and the trial the competition. The prosecution is to use its own resources to gather and marshal the evidence without the unwilling assistance of the accused, and the accused is left to defend himself if the prosecution succeeds in making out a case against him. It is thought to be behind key principles of criminal justice like the voluntariness rule for confessions, the discretion to exclude improperly obtained evidence and the presumption of innocence.

*Id.* (footnote omitted).

[7]     *Cosby*, 252 A.3d at 1138 (quoting *Malloy v. Hogan*, 378 U.S. 1, 7 (1964)).

power of the government, and stands as an indispensable rampart between that government and the governed."[8]  As the Supreme Court of the United States explained in *Murphy v. Waterfront Commission of New York Harbor*:[9]

> The privilege against self-incrimination "registers an important advance in the development of our liberty—'one of the great landmarks in man's struggle to make himself civilized.'" *Ullmann v. United States*, 350 U.S. 422, 426 (1956) [(quoting ERWIN N. GRISWOLD, THE FIFTH AMENDMENT TODAY 7 (1955))].  It reflects many of our fundamental values and most noble aspirations:  our unwillingness to subject those suspected of crime to the cruel trilemma of self-accusation, perjury or contempt; our preference for an accusatorial rather than an inquisitorial system of criminal justice; our fear that self-incriminating statements will be elicited by inhumane treatment and abuses; our sense of fair play which dictates "a fair state-individual balance by requiring the government to leave the individual alone until good cause is shown for disturbing him and by requiring the government in its contest with the individual to shoulder the entire load," 8 Wigmore, Evidence (McNaughton rev., 1961), 317; our respect for the inviolability of the human personality and of the right of each individual "to a private enclave where he may lead a private life," *United States v. Grunewald*, 233 F.2d 556, 581-582 (Frank J., dissenting), *rev'd* 353 U.S. 391 (1957); our distrust of self-deprecatory statements; and our realization that the privilege, while sometimes "a shelter to the guilty," is often "a protection to the innocent." *Quinn v. United States*, 349 U.S. 155, 162 (1955).[10]

"Most, if not all, of these policies and purposes are defeated when a witness 'can be whipsawed into incriminating himself[.]'"[11]  The right against self-incrimination cannot serve these policies and purposes if a person can be punished for his decision to invoke the right.  Such punishment occurs when that decision is used against that defendant later at trial.

---

[8]     *Id.* at 1138-39.

[9]     378 U.S. 52, 55 (1964).

[10]     *Id.* (quotation marks, punctuation, and citations modified; footnote omitted).

[11]     *Id.* (quoting *Knapp v. Schweitzer*, 357 U.S. 371, 385 (Black, J., dissenting)).

*Griffin v. California* is illustrative.[12] There, a capital defendant elected not to testify in the guilt phase of his trial. The prosecutor seized upon the decision, emphasizing to the jury that, while the murder victim could not explain what had happened on the night in question, the defendant could, but refused to do so.[13] The trial court instructed the jury that, while the defendant had a constitutional right not to testify, if he chooses to exercise that right, or if he chooses to take the stand but fails to explain the evidence against him, then the jury could consider any uncontested or unexplained evidence (and reasonable inferences) to be true. The court cautioned the jury that the decision not to testify did not create a presumption of guilt nor did it relieve the prosecution of its burden.[14] Nonetheless, the trial court permitted the jury to consider the invocation of the Fifth Amendment against the defendant. The defendant was convicted and sentenced to death.[15]

The Supreme Court of the United States reversed. The Court noted that any "comment on the refusal to testify" harkened back to the long-abandoned "inquisitorial system of criminal justice," a system forbidden by the Fifth Amendment.[16] The prosecution's exploitation of the decision to remain silent at trial imposes a "penalty . . . for exercising a constitutional privilege. It cuts down on the privilege by making its assertion costly."[17] In both federal and state trial, the Court held, the Fifth Amendment

---

[12] 380 U.S. 609, 610 (1965).

[13] *Id.* at 610-11.

[14] *Id.* at 610.

[15] *Id.* at 611.

[16] *Id.* at 614 (citing *Murphy*, 378 U.S. at 55).

[17] *Id.* at 614.

"forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is [substantive] evidence of guilt."[18]

Although a defendant's silence can never be used as substantive evidence, the same cannot be said for its use as impeachment evidence. One year after *Griffin*, the Court decided *Miranda*, which permanently altered the way in which police officers can interview suspects and in which prosecutors can use confessions at trial. To safeguard the right against self-incrimination, the *Miranda* Court developed a set of "prophylactic rules."[19] Those rules aim to ensure that the decision whether to speak to the police is a knowledgeable and voluntary one. Once a police officer takes a person into custody, the officer must advise the person immediately "that he has the right to remain silent, that anything he says may be used against him, and that he has a right to retained or appointed counsel before submitting to an interrogation."[20] Silence in the wake of these warnings is "insolubly ambiguous."[21] The decision may be the product of fear, confusion, or lack of trust. It may be a calculated decision that one makes in an effort to protect oneself. Or, it "may be nothing more than the arrestee's exercise of these *Miranda* rights."[22]

Although the warnings expressly inform suspects that anything *said* may be used against them at trial, the warnings offer "no express assurance that *silence* will carry no penalty."[23] Nonetheless, "such assurance is implicit to any person who receives the

---

[18]     *Id.* at 615.

[19]     *Michigan v. Tucker*, 417 U.S. 433, 439 (1974).

[20]     *Doyle v. Ohio*, 426 U.S. 610, 617 (1976).

[21]     *Id.*

[22]     *Id.*

[23]     *Id.* at 618 (emphasis added).

warnings," and it would be "fundamentally unfair"[24] to punish someone for his or her silence. For these reasons, in *Doyle v. Ohio*, the Supreme Court held that the Due Process Clause of the Fourteenth Amendment prohibits prosecutors from using a defendant's post-*Miranda* silence to impeach that defendant when he or she later testifies at trial.[25]

The same is not true when the invocation of silence precedes the administration of *Miranda* warnings. When there are no warnings, there is no implicit assurance that the suspect's silence will not be punished. Thus, pre- and post-*Miranda* silence are not the same for purposes of the Due Process Clause.[26] In *Jenkins v. Anderson*, the Supreme Court held that, because there can be no breach of *Miranda*'s implicit promise in pre-*Miranda* invocations of silence, a defendant can be impeached with that silence without violating either the Fifth or Fourteenth Amendments.[27] Similarly, in *Fletcher v. Weir*, the Supreme Court held that a defendant can be impeached with a post-arrest invocation of silence without violating due process when no *Miranda* warnings are given.[28]

---

[24] *Id.*

[25] *Id.* at 619.

[26] *Jenkins v. Anderson*, 447 U.S. 231, 240 (1980) (explaining that, because the decision to remain silent occurred before arrest and before *Miranda* warnings were given, "the fundamental unfairness present in *Doyle* is not present").

[27] *Id.* at 238, 240. The Supreme Court also noted that the use of a defendant's decision to invoke his right to remain silent as impeachment evidence differs significantly from the use of the same as substantive evidence. The latter is offered by the prosecutor as evidence of guilt during the prosecution's case-in-chief, without regard to whether the defendant elects to testify in his own defense. The former, on the other hand, can only be raised by a prosecutor when the defendant takes the stand, and "follows the defendant's own decision to cast aside his cloak of silence and advances the truth-finding function of the criminal trial." *Id.* at 238. The reasons that these two types of evidence are treated differently in this area of law are self-evident.

[28] 455 U.S. 603, 605-07 (1982) (*per curiam*).

Thus, the use of silence as impeachment evidence depends largely upon if, and when, *Miranda* warnings are provided to the suspect. However, *Doyle*'s rule against the use of post-arrest, post-*Miranda* invocations of silence as impeachment evidence is not an ironclad prohibition against *any* use of the evidence. In *United States v. Robinson*, defense counsel told the jury during closing arguments that the prosecutor "had not allowed [the defendant] to explain his side of the story."[29] The prosecutor responded during his own closing argument, emphasizing to the jury that the defendant "could have taken the stand and explained it to you[.]"[30] The Supreme Court characterized the prosecutor's comment as a "fair response" to the defense's argument, and found no violation of the Fifth Amendment when the prosecution utilized the defendant's post-*Miranda* silence in this manner.[31] The *Robinson* Court acknowledged that, in *Griffin*, the Court had proscribed the use of silence when it was done without legal prompt, *i.e.*, when the prosecutor did it upon his own initiative. The "fair response" doctrine is something entirely different:

> It is one thing to hold, as we did in *Griffin*, that the prosecutor may not treat a defendant's exercise of his right to remain silent at trial as substantive evidence of guilt; it is quite another to urge, as defendant does here, that the same reasoning would prohibit the prosecutor from fairly responding to an argument of the defendant by adverting to that silence. There may be some "cost" to the defendant in having remained silent in each situation, but we decline to expand *Griffin* to preclude a fair response by the prosecutor in situations such as the present one.[32]

This Court has recognized the "fair response" doctrine as a necessary device because "the protective shield of the Fifth Amendment may not be converted into a sword that cuts

---

[29]     485 U.S. 25, 26 (1988).

[30]     *Id.* (citation to the record omitted).

[31]     *Id.* at 32.

[32]     *Id.* at 33-34.

back on an area of legitimate inquiry and comment by the prosecutor on the relevant aspects of the defense case."[33]

Commentary upon a defendant's earlier silence is more restricted under the Pennsylvania Constitution than under the United States Constitution. In *Commonwealth v. Turner*, the defendant testified that he shot and killed the victim in self-defense.[34] On cross-examination, the prosecutor asked the defendant if he had explained his version of events to the police. In fact, the defendant had never spoken to the police, and the police had never provided the defendant with *Miranda* warnings. The trial court sustained a defense objection to the question, and provided a cautionary instruction to the jury. The defendant was convicted of voluntary manslaughter.[35]

On appeal to this Court, we first noted that, pursuant to *Fletcher*, under the United States Constitution, a defendant's pre-*Miranda* silence may be used to impeach the defendant's testimony at trial. However, that principle is inconsistent with how Pennsylvania has "traditionally viewed" references to a defendant's choice to remain silent.[36] The problem, we explained, is that there is a "strong disposition"[37] for jurors to interpret invocations of silence as implicit admissions of guilt:

> "We would be naive if we failed to recognize that most laymen view an assertion of the Fifth Amendment privilege as a badge of guilt." *Walker v. United States* [404 F.2d 900 (5th Cir. 1968)], ... It is clear that "[t]he privilege against self-incrimination would be reduced to a hollow mockery if its exercise could be taken as equivalent either to a confession of guilt or a

---

[33]     *Commonwealth v. Copenhafer*, 719 A.2d 242, 251 (Pa. 1998) (citations omitted).

[34]     454 A.2d 537, 538 (Pa. 1982).

[35]     *Id.*

[36]     *Id.* at 539.

[37]     *Id.* (citing *Commonwealth v. Singletary*, 387 A.2d 656, 657 (Pa. 1978); *Commonwealth v. Greco*, 350 A.2d 826, 828 (Pa. 1976); *Commonwealth v. Haideman*, 296 A.2d 765, 767 (Pa. 1972)).

conclusive presumption of perjury." *Slochower v. Board of Higher Ed. of N.Y.* [350 U.S. 551 (1956)].[38]

Because the resultant prejudice from such a reference was "substantial," this Court was concerned that allowing prosecutors to use silence to impeach the particulars of the defendant's in-court testimony generated too high a risk of injecting that prejudice into the trial. The value of such impeachment was not "sufficiently probative" to "warrant allowance of any reference at trial to the silence."[39] This Court instead approved a much more limited use:

> the Commonwealth must seek to impeach a defendant's relation of events by reference only to inconsistencies as they factually exist, not to the purported inconsistency between silence at arrest and testimony at trial. Silence at the time of arrest may become a factual inconsistency in the face of an assertion by the accused while testifying at trial that he related this version to the police at the time of arrest when in fact he remained silent. Absent such an assertion, the reference by the prosecutor to previous silence is impermissible and reversible error.[40]

In other words, in Pennsylvania, a prosecutor may only impeach a testifying defendant if that defendant alleges that his in-trial testimony is consistent with what he told the police earlier. If, in fact, he never spoke to the police, and never provided the police the version he conveyed to the jury, then the prosecutor may reveal to the jury through cross-examination that the defendant had maintained his silence prior to trial.

The *Turner* Court deviated from the United States Supreme Court's ruling in one other substantive way. While the United States Supreme Court's jurisprudence in this area of law hinges largely upon when the invocation of silence occurs in relation to the provision of *Miranda* warnings, this Court took a much more expansive view of the right

---

[38] *Id.*

[39] *Id.*

[40] *Id.* at 539-40 (citation omitted).

to remain silent, and found that the provision of *Miranda* warnings largely is irrelevant to whether the defendant can be asked about his silence at trial. Noting that Article I, Section 9 of the Pennsylvania Constitution explicitly guarantees that an accused "cannot be compelled to give evidence against himself,"[41] our Court refused to limit that protection only to circumstances where there is governmental inducement of the exercise of the right."[42] *Miranda* warnings (or their absence) do not affect "a person's legitimate expectation not to be penalized for exercising the right to remain silent."[43]

To summarize, whether in federal court or state court, a prosecutor can never introduce a defendant's invocation of silence as substantive evidence.[44] There are two exceptions to this rule: use of silence as impeachment, and use of silence as a "fair response" to an argument or assertion of the defense. Under federal law, a prosecutor is free to impeach the defendant's in-court testimony with the mere fact of the defendant's earlier silence. Under Pennsylvania law, the prosecutor can impeach the defendant's testimony with his prior silence only if the defendant states that his in-court version of events is consistent with what he told the police, and if this, in fact, is false because the defendant never spoke to the police.

Those are the rules. And there are consequences for violating them. As the *Turner* Court emphasized, the overwhelming concern with erroneous references to a person's silence is the inherent inclination of lay jurors to interpret the decision to remain silent as

---

[41] PA. CONST. art. I, § 9.

[42] *Turner*, 454 A.2d at 540.

[43] *Id.*

[44] *See Griffin*, 378 U.S. at 615; *Commonwealth v. Molina*, 104 A.3d 430, 451 (Pa. 2014) (plurality) (holding that admission of a defendant's pre-arrest silence as substantive evidence violates the constitutional privilege against self-incrimination).

a tacit admission of guilt.[45] It is natural for a person to expect an innocent person to proclaim such innocence at the first, and every, opportunity to do so. It is all too easy to conclude that a person who declines to do so must be guilty. This line of thinking is difficult, if not impossible, to erase from a juror's mind. Furthermore, the prejudice that results from this assumption effectively imposes a penalty upon a defendant for exercising the rights guaranteed to him by our Constitutions.[46]

References to this "highly prejudicial evidence"[47] do not, however, warrant automatic reversal. Notwithstanding this Court's concern that the privilege against self-incrimination would be reduced to a "hollow mockery" if courts permitted its invocation to be treated as a tacit confession of guilt or as a presumption of perjury,[48] courts still must examine whether an errant reference was harmless or was made in a way unlikely to provoke such concerns. Courts must be careful to avoid making the same mistake that the Superior Court made in this case. Like so many aspects of the law governing invocations of silence, the applicable rules and concerns differ based upon the juncture at which the invocation of silence occurred. For instance, in *Commonwealth v. Whitney*, we held that, "[e]ven an explicit reference to silence is not reversible error where it occurs in a context not likely to suggest to the jury that silence is the equivalent of a tacit admission of guilt."[49] Similarly, in *Commonwealth v. DiNicola*, we cautioned that "the

---

[45] *See also Singletary*, 387 A.2d at 657 (explaining that "a lay person could and probably would consider this silence to be an unnatural reaction unless the accused was in fact guilty").

[46] *See Haideman*, 296 A.2d at 767-78.

[47] *Greco*, 350 A.2d at 828.

[48] *Turner*, 454 A.2d at 539 (citations omitted).

[49] 708 A.2d 471, 478 (Pa. 1998) (citation omitted).

mere revelation of silence does not establish innate prejudice."[50]  But, as the Majority correctly highlights, these cases involve pre-arrest silence, not post-arrest silence.[51] Whether a pre-arrest reference amounts to reversible error depends upon whether the jury is likely to construe the silence as a tacit admission of guilt, or whether the reference was "limited to its context" or "circumspect."[52]

Importantly, the Majority reminds that references to post-arrest silence engender much more than *de minimis* prejudice.[53]  As the Majority notes, when reviewing the impact of such errors, courts cannot lose sight of the fact that we previously have deemed them to be "constitutionally impermissible," "highly prejudicial," and "substantial."[54]  I agree that, while such errors do not amount to structural error, it is hard to fathom how an error of

---

[50]    866 A.2d 329, 336-37 (Pa. 2005).  It is nearly impossible to remove from jurors' mind the prejudice that the United States Supreme Court and this Court have consistently acknowledged accompanies references to a person's silence.  The risk is too great that jurors will misinterpret the decision to remain silent as an implicit admission of guilt. *DiNicola*'s pronouncement that prejudice does not inevitably follow references to a defendant's silence is inconsistent with this fundamental concern.  This Court should revisit *DiNicola* and reconsider that conclusion in an appropriate case.

[51]    Maj. Op. at 31; *see also Commonwealth v. Adams*, 104 A.3d 511 (Pa. 2014) (plurality), another pre-arrest silence case relied upon by the Commonwealth in this appeal and by the Superior Court below.

[52]    *DiNicola*, 866 A.2d at 337.  The appeal before us today arises from a post-arrest case, not a pre-arrest case.  Thus, the "contextual" and "circumspect" measuring sticks are not at issue, and are not ripe for reconsideration here.  However, this Court should avail itself of some future opportunity to reconsider these amorphous and boundless standards.  With the substantial risk of prejudice attending errors in this area of law, trial courts should be given a clear, workable standard to use when deciding whether to allow prosecutors to reference a defendant's pre-arrest silence.  "Contextual" and "circumspect" are neither clear nor workable benchmarks.  They are vague terms that make it harder, not easier, for trial courts to render accurate decisions.  "This is no rule.  It is only muddle and confusion."  *Commonwealth v. Bishop*, 217 A.3d 833, 850 (Pa. 2019) (Wecht, J., dissenting).  Today is not the day to re-examine this standard.  But the day should come sooner rather than later.

[53]    Maj. Op. at 31.

[54]    *Id.* (citations omitted).

such magnitude—one that all but guarantees substantial prejudice—can at the same time be characterized as causing "insignificant" prejudice for harmless error purposes.[55] Any harmless error analysis must recognize that this type of error is substantial, and must appreciate the magnitude of the prejudice that is conveyed to the jurors' minds when such evidence is introduced. Mindful of these concerns, this Court in *Molina* wisely reminded trial judges that "it is far worse to conclude incorrectly that the error was harmless than it is to conclude incorrectly that the error was reversible."[56] For all the reasons outlined by today's Majority, the error in this case was not harmless, and a new trial is warranted.

At trial, defense counsel asked the arresting Pennsylvania State Police trooper whether he had spoken to Rivera prior to arresting him. The trooper conceded that he had not done so. In response to this probe of the trooper's pre-arrest actions, the Commonwealth asked a series of questions that permitted the jury to hear that Rivera had invoked his right to remain silent *after* being arrested.

When the trooper testified that, after being arrested and after receiving his *Miranda* warnings, Rivera "never denied doing anything,"[57] defense counsel objected. The basis for the objection was the fact that the question would violate the privilege against self-incrimination.[58] In a confounding ruling, the trial court stated that, while defense counsel was "correct," the Commonwealth was "just asking if he did."[59] The trial court appeared

---

[55]    *See id*. at 34 n.20 (noting that, for purposes of a harmless error analysis, a court must contemplate whether the prejudicial effect of the error was "insignificant by comparison" to the balance of the trial evidence) (citations omitted).

[56]    *Molina*, 104 A.3d at 455 (quoting *Commonwealth v. Davis*, 305 A.2d 715, 719 (Pa. 1973).

[57]    Notes of Testimony ("N.T."), 8/7/2019, at 101-02.

[58]    *Id.* (defense counsel asserting that "[a] person doesn't have to deny.")

[59]    *Id.*

to agree that a person is not required to make any statements to the police, nor to deny the allegations against him.  At the same time, however, the trial court believed that the prosecution still may have its witness tell the jury that the arrestee did not make that denial.  In the face of the governing law, the trial court told the trooper that "[he] may answer."[60]  The trooper stated at least four times that, after his arrest, Rivera did not deny the allegations, and that Rivera elected not to talk to law enforcement at all.[61]  Whether the trial court was confused or simply mistaken, the result of its ruling reduced Rivera's right against self-incrimination to a "hollow mockery."[62]  The ruling—as explained in front of the jury—was a violation of the privilege and broke the solemn promise of the Fifth-Amendment, that a person can remain silent and will not be punished for it.

The Commonwealth's arguments in this appeal notwithstanding, the trial court did not state at the time that the trooper's testimony was a "fair response" to the defense's questions of the trooper regarding the post-arrest events.  Instead, the trial court offered an unconstitutional (and contradictory) ruling.  Nonetheless, had the court in fact asserted the "fair response" exception, for all of the reasons correctly explained by the Majority,[63] that justification fails.  Questions about a defendant's pre-arrest silence "do not open the door"[64] to questions about that defendant's post-arrest behavior.

This area of law is perilous for prosecutors.  The jurisprudence varies depending upon the forum in which the case arises, the timing of the relevant events of the investigation, and the shifting legal landscape of the trial.  The consequences for eliciting

---

[60]     *Id.*

[61]     *Id.*

[62]     *Turner*, 454 A.2d at 539.

[63]     *See* Maj. Op. at 28.

[64]     *Id.*

an answer from a witness that violates the privilege are severe. The prejudice that results is nearly incapable of being overcome, no matter how strong the balance of the Commonwealth's evidence is. As the Majority aptly observes, an errant reference by the prosecutor "may imperil an entire case,"[65] and "risks reducing to rubble an entire prosecution."[66]

With so much at stake, it is unnecessarily risky for prosecutors to delve into a defendant's silence in front of the jury without taking precautions to protect the case from prejudice and future reversal. Rather than diving straight into questions that implicate a defendant's decision to remain silent, prosecutors should put the issue to the trial court for a ruling before allowing the jury to hear it. Doing so may not eliminate all potential for prejudice, as the trial court still may issue an incorrect ruling. But, the amount of prejudice that questions on this topic can inflict on a case is obvious. If the prosecutor unconstitutionally inquires into a defendant's silence, that bell is nearly impossible to un-ring. The risk is not worth the reward. The all-but-certain reversal, and a subsequent re-trial, can be avoided by giving the trial court the opportunity to keep the evidence out *before* the jury hears it.

There are two ways to do this. First, the prosecutor can file a motion *in limine* before trial and ask the trial court for leave to pursue the line of inquiry. This route rarely will be a viable option. The prosecutor would have to know that the defendant intends to testify and that he will testify in a way that would implicate the prosecutor's limited ability to raise the defendant's silence. This scenario rarely arises, as many defendants do not decide to testify until after the prosecution has presented its case-in-chief. And, even

---

[65]     *Id.* at 22.

[66]     *Id.* at 28.

then, the prosecutor still does not know, and cannot know, what the defendant will say on the stand.

The second option is a better one, and should be employed as a routine matter in these (and similar) circumstances.  Before asking any questions that implicate the defendant's silence, regardless of whether that silence was pre- or post-arrest, the prosecutor should ask for a sidebar, approach the bench, and get a ruling from the trial court.  That way, the prosecutor can argue to the judge how and why the questions are probative and relevant, and can invoke the impeachment exception or the "fair response" doctrine.  The defense can raise any objections and can argue against the prosecutor's reasoning.  Then, the trial court can make an informed ruling.  If the information is not admissible, the trial court may preclude the questions before the jury hears them and is prejudiced, *i.e.*, before the entire prosecution is jeopardized.

No legal principle of which I am aware *requires* prosecutors to follow this protocol. But, it is the best way to ensure that the jury is not exposed to highly prejudicial information that it was not permitted to hear.  This approach not only would conserve limited judicial resources, but it also would avoid subjecting victims, police officers, and the defendant to the inevitable retrial.